1
2
3
4
5
6
7
8
9
10
11
12

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMI LANEA HENSHAW, | Case No.  1:14-cv-01788-SKO |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S COMPLAINT** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

## INTRODUCTION

Plaintiff Tami Lanea Henshaw ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C. §405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge for all purposes.  (Docs. 6, 7.)

# FACTUAL BACKGROUND

Plaintiff was born in 1966, completed high school and vocational courses to become a Medical Assistant and Therapeutic Health Technician, and worked as a medical assistant from 2004 to 2008 and as a home health aide for two months in 2010.  (Administrative Record ("AR") 167.)  She alleged disability beginning on July 16, 2008, due to chronic obstructive pulmonary disease, arthritis, poor vision in her right eye, autoimmune symptoms, and depression.  (AR 166, 195.)

## A.    Relevant Medical Evidence

Plaintiff underwent a hysterectomy in July 2008 and subsequently reported that she was experiencing fatigue, but her pain was tolerable.  (AR 341-43).  In September 2008, Plaintiff reported vision complications and indicated she was nervous and cried frequently; she was prescribed Prozac.  (AR 341-42.)  Following her hysterectomy, Plaintiff began seeing a retinal specialist for her blurry vision.  (AR 434.)  Upon examination, Tony Tsai, M.D., noted that Plaintiff's visual acuity was 20/200, indicated she had pars planitis,[2] and administered a steroid injection.  (AR 516-17).

On October 2008, Dr. Tsai noted Plaintiff's eye condition had improved and administered another steroid injection.  (AR 515.)  In December 2008, Dr. Tsai noted floaters in Plaintiff's left eye.  (AR 425.)

In December 2008, Plaintiff requested a prescription for Xanax due to anxiety.  (AR 722.)  In March 2009, Plaintiff reported an inability to concentrate due to depression and indicated she was still having problems with her eyes.  (AR 335.)  A doctor's note was written to excuse her from jury service for one year.  (AR 335.)  Also in March 2009, Dr. Tsai noted Plaintiff's pars planitis was controlled, but she was still experiencing pain and her vision was worsening.  (AR 420, 511.)

---

[2] Pars planitis refers to inflammation of the anterior chamber, the anterior vitreous, and/or the peripheral retina of the eye.  *See* https://rarediseases.info.nih.gov/gard/7339/pars-planitis/resources/1 (last visited 2/10/16).

1    In April 2009, Plaintiff reported feelings of depression and was referred to a counselor.
2  (AR 333.)   Lexapro was prescribed in addition to Pristiq.   (AR 332-33.)   At a follow-up
3  examination, Plaintiff indicated she liked her counselor.  (R 332.)

4    In May 2009, Plaintiff's vision continued to worsen, and Dr. Tsai referred her to an
5  infectious disease specialist, David A. Olson, M.D.  (AR 331.)  Dr. Olson evaluated Plaintiff's eye
6  condition, hypothesized she may have an autoimmune disease, and ordered blood tests for a
7  rheumatoid factor, ANA,[3] and Lyme serology.  (AR 379.)  Dr. Olson indicated if any of these tests
8  were positive, Plaintiff would return for a follow-up.  (AR 379.)

9    In June 2009, Plaintiff's health care provider indicated that returning to work would
10  improve Plaintiff's depression and felt Plaintiff's vision was improved enough that she could go
11  back to work.  (AR 330.)

12    In July 2009, Plaintiff saw Dr. Olson for treatment for a "persistent eruption" on her left
13  foot for which she received topical medication and was told to follow up in three weeks.
14  (AR 376.)  In October 2009, Plaintiff saw Dr. Tsai for a dull ache in her eyes and reported floaters
15  and flashes.  (AR 412.)  Dr. Tsai prescribed Prednisone and observed a worsening cataract in
16  Plaintiff's right eye.  (AR 412-13, 507.)   Plaintiff underwent cataract extraction and surgical
17  implantation of an intraocular lens in her right eye.  (AR 324, 526.)  In September 2009, Plaintiff
18  began classes for health practitioners, and she began training as a physical therapist technician in
19  December 2009.  (AR 325.)

20    In February 2010, Plaintiff reported the vision in her right eye had improved after her
21  surgery, but shortly thereafter, her vision worsened.  (AR 409-10.)  In October 2010, Plaintiff
22  reported redness, swelling, and watering in her right eye and worsening vision in her left eye.
23  (AR 401-02.)  Dr. Tsai observed that Plaintiff's par planitis was "quiet."  (AR 402.)

24    In October 2010, Plaintiff saw Dr. Olson for ongoing foot pain, and it was noted that
25  Plaintiff's asthma had worsened, and she used oxygen in addition to a nebulizer and inhaler.
26  (AR 359.)  Plaintiff reported she was feeling well otherwise.  (AR 359.)

27
28

---

[3] The antinuclear antibody ("ANA") test is used to evaluate a person for autoimmune disorders that may affect tissues and organs throughout the body.  *See*  http://www.mayoclinic.org/tests-procedures/ana-test/basics/definition/prc-20014566 (last visited 2/10/16).

1    In November 2010, Plaintiff reported increased fuzziness and "cob webs" in her right eye;

2    Dr. Tsai noted increased vitritis debris in her right eye, and administered an intraocular steroid

3    injection into her right eye.  (AR 399-400.)

4    In January 2011, Plaintiff reported headaches and pressure, and Dr. Tsai injected an

5    implant into Plaintiff's right eye.  (AR 658-60.)  In February 2011, Dr. Tsai indicated Plaintiff's

6    right eye vitritis was improved, but Plaintiff reported her vision was still blurry, and the floaters in

7    her left eye and her headaches had increased.  (AR 653-54.)

8    On March 4, 2011, Plaintiff was examined by Frank Chen, M.D., an internist, at the

9    request of the state agency.  (AR 526-28.)  Dr. Chen indicated there were no medical records

10   available for review.  (AR 526.)  Plaintiff's chief complaints were Chronic Obstructive Pulmonary

11   Disease ("OCPD"); chronic pain in her feet, hands, and shoulders; impaired vision in both eyes;

12   and pain and swelling of her left knee.  (AR 526.)  Dr. Chen noted a pulmonary function test

13   ("PFT") on the day of the examination showed moderate obstructive ventilatory defect and

14   moderate restrictive defect.  (AR 528.)  He indicated doubts whether she had fibromyalgia, and

15   that her knee was negative for pain on examination.  (AR 528.)  He opined Plaintiff remained able

16   to

17   stand and walk for six hours in an eight-hour workday.  She can sit for six hours in
      an eight-hour day.  It is not medically necessary for the claimant to use an assistive
18   device for short distances although she may use a can for long distances.  She can
      lift and carry 50 pounds occasionally and 25 pounds frequently.  Oxygen therapy is
19   per her physician's prescription.

20   (AR 528.)

21   On March 25, 2011, Plaintiff was again examined by Dr. Tsai and reported major

22   headaches, and while her right eye was beginning to clear, her left eye was blurry with a lot of

23   floaters.  (AR 643, 646.)  Dr. Tsai prescribed Prednisone drops and indicated steroid injections

24   might be necessary.  (AR 643, 646.)  In April 2011, Dr. Tsai indicated increased vitritis in

25   Plaintiff's left eye and administered an injection into that eye.  (AR 605.)

26   On May 26, 2011, Plaintiff underwent a psychological mental status evaluation with Carol

27   W. Fetterman, Ph.D.  (AR 550-53.)  Dr. Fetterman observed that Plaintiff presented in a friendly

28   manner, and made poor eye contact wearing dark glasses which she kept on.  (AR 550.)  Her gross

motor function was normal, but she was not able to ambulate without assistance.  (AR 550.)  She did not have difficulty handling objects, reading, or completing the history form.  (AR 550.)  Plaintiff was able to visually go place to place in the examination office without bumping into walls or holding onto furniture.  (AR 550.)  Dr. Fetterman diagnosed her with a depressive disorder and provided the following functional assessment:

> This claimant's ability to understand, remember, and carry out job instructions was assessed to be unimpaired as evidenced by her performance on the mental status examination.
>
> Her ability to maintain attention, concentration, persistence and pace was assessed to be unimpaired based on performance on the mental status exam and observation during the interview.
>
> The claimant's ability to relate and interact with supervisors, co-workers, and the public was assessed to be unimpaired based on her current mood quality, attitude, and willingness to follow instructions and cooperation during this contact period.
>
> Her ability to adapt to day-to-day work activities, including attendance and safety, was assessed to be mildly impaired based on her current mental status and presentation.

(AR 552.)  Based on the results of the mental status examination, Dr. Fetterman opined Plaintiff is able to adequately perform one- to two-step simple repetitive tasks; she has a good ability to accept instructions from supervisors and interact with co-workers and the public; she has a fair ability to maintain regular attendance in the workplace as mental health symptoms may impact attendance, complete a normal workday or workweek without interruptions from a psychiatric condition as mental health symptoms may impact attendance, and handle normal work-related stress from a competitive work environment.  (AR 552-53.)

On June 2, 2011, state agency physician Kay Cogbill, M.D., reviewed Plaintiff's medical records and opined Plaintiff would be moderately limited in performing detailed tasks, carrying out a normal workday and workweek and making realistic goals and plans.  (AR 557.)  She opined Plaintiff retained the ability to perform semi-skilled work.  (AR 556.)

On June 27, 2011, Plaintiff followed up with Dr. Olson, complaining of shortness of breath.  (AR 601.)  She indicated she had been using her nebulizer more often, and was trying to

1   get disability because she was gradually losing her sight.  (AR 601.)  Dr. Olson referred Plaintiff

2   to a pulmonologist.  (AR 601.)

3       On August 9, 2011, Plaintiff asked Dr. Olson to complete a disability questionnaire

4   regarding Plaintiff's impairments.  (AR 666.)  Dr. Olson opined Plaintiff's impairments were

5   asthma and COPD, which precluded her from doing anything other than sedentary work.  (AR

6   666.)  He opined she would be able to sit for 1.5 hours, stand or walk for 20 minutes, and that she

7   was restricted from dust, fumes, temperature extremes, and had marked impairment of working

8   with machinery due to vision problems.  (AR 666.)

9       On August 26, 2011, Paul Crenshaw, licensed clinical social worker (LCSW), opined

10  Plaintiff was unable to deal with complex social interactions, she had poor concentration and an

11  impaired capacity for effective problems solving; she had a poor ability to maintain concentration

12  and attention for at least two-hour increments; and her short-term memory was impaired.

13  (AR 664.)

14      On November 8, 2011, Plaintiff saw pulmonologist Drew H. Logue, M.D., and underwent

15  pulmonary function testing pre- and post-bronchodilator with lung volumes.  His impression on

16  testing was as follows:  "A profound bronchodilator response is noted with this study.  The

17  diffusing capacity is in the normal range.   Findings are compatible with asthma with

18  bronchodilator response.  A restrictive component may be present but is unlikely given the normal

19  diffusing capacity."  (AR 803.)  Plaintiff's FEV1[4] results showed 1.18 liters and 1.89 liters, post-

20  bronchodilator.  (AR 803.)

21      In December 2011, Plaintiff followed-up with Dr. Logue who indicated her pulmonary

22  function study "is compatible with severe obstructive lung disease with a near-normal diffusing

23  capacity."  (AR 799.)  He recommended a long-acting bronchodilator/inhaled steroid combination

24  and noted she was still on supplemental oxygen, although he was "not clear as to the ongoing

25  needs or benefits of supplemental oxygen."  (AR 799.)  He also noted she had undergone a sleep

26

27  _____

28  [4] FEV1/FVC ratio is also called Tiffeneau-Pinelli index and is a calculated ration used in the diagnosis of lung disease; it is the measure of air that can be forcefully exhaled in one second.  *See* http://www.mayoclinic.org/tests-procedures/spirometry/basics/results/prc-20012673 (last visited 2/10/16).

study which showed she did not have significant sleep-disordered breathing.  He indicated she would return in a few months for follow-up.  (AR 799.)

In February 2012, Plaintiff experienced a flare up of headaches, blurry vision, and light sensitivity.  (AR 949-50.)  Dr. Tsai reported vitritis detritus in her right eye and inflammation in both eyes.  (AR 949-50.)

On April 20, 2012, Dr. Tsai completed a questionnaire regarding Plaintiff's condition. (AR 937-38.)  He opined Plaintiff's fine vision was impaired and her visual acuity was reduced in both eyes to 20/80; she required magnifiers for small print.  (AR 937.)  Dr. Tsai indicated she had photosensitivity and difficulty under bright light conditions and opined Plaintiff should be restricted from working around heights, dangerous equipment, or moving machinery.  (AR 937.)

On June 29, 2012, Dr. Olson completed another form indicating Plaintiff was unable to work.  (AR 940-41.)  He indicated her primary impairment was of a respiratory nature, and she required continuous oxygen.  (AR 940.)  He predicted she would only be able to sit for 30 minutes, and stand or walk for 10 minutes.  (AR 940.)  Mr. Crenshaw also submitted another report regarding Plaintiff's mental symptoms.  (AR 942.)  He opined Plaintiff's depression and anxiety impaired her ability to deal with social situations; her ability to maintain concentration and attention was poor; she was anxious and fearful when dealing with the public; and her ability to handle funds was poor due to short-term memory problems.  (AR 942.)

On September 18, 2012, Plaintiff was examined by Philip A. Edington, M.D., an ophthalmologist.  (AR 1114.)  Upon examination, Dr. Edington noted Plaintiff had pseudophakia[5] in her right eye, an early cataract on her left eye, and chronic relapsing inflammation.  (AR 1114.) He opined her condition was likely to be "chronic and stationary."  (AR 1114.)

**B.     Lay Testimony**

Plaintiff submitted an adult function report in January 2010 reporting she experienced constant pain in her knees and feet, and in her eyes when overused or exposed to bright lights. (AR 182.)  She used oxygen all night and during the day as necessary, and she used an inhaler and

---

[5] Pseudophakic is the most common type of intraocular lenses that are implanted in the eye for treatment of cataracts or myopia. *Dorland's Illustrated Medical Dictionary* 1568 (31st ed. 2007).

took Alprazolam.  (AR 183.)  She reported fatigue since January 2008, which required her to take two or more naps during the day, which lasted from 45 minutes to one hour.  (AR 182.)  On an average day, she got her son ready for school, rested, did laundry three times a week, and cooked with the help of her husband and son.  (AR 184-86.)  She was seated when she cooked or washed the dishes, and her son took care of the pets and did the sweeping, mopping, vacuuming, and cleaning the bathroom.  (AR 185, 187.)  She went to the mailbox once a day and grocery shopping once a week, sometimes with oxygen, but required assistance if she could not get a motorized chair.  (AR 187.)  She did not drive at night because of poor eyesight.  (AR 183-89.)

She estimated she could lift about 10 pounds, climb two to four steps, stand for 20 minutes, and walk up to 50 feet at one time. (AR 189.)  She had difficulty concentrating and she no longer handled stress or changes in routine very well.  (AR 189-90.)

She submitted an additional disability report in August 2011 indicating her left-eye problems had increased and her breathing and depression had worsened.  (AR 195.)

**C.      Administrative Hearing**

The Commissioner denied Plaintiff's application initially and again on reconsideration. (AR 75-77, 82-87.)   Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 88-92.)   On July 26, 2012, an ALJ held a hearing in which Plaintiff, represented by counsel, and vocational expert Kenneth Ferra testified.  (AR 41-69.)

**1.      Plaintiff's Hearing Testimony**

Plaintiff appeared for the hearing with a sight-impaired cane she had for over a year. (AR 44.)  She wears glasses to protect her eyes from light as she is very light sensitive, which causes "bad headaches."  (AR 45.)  She last worked as an in-home health care provider, but she could not continue performing the work because she could not lift patients.  (AR 47.)  She was also unable to drive a vehicle as she has no license upon her doctor's recommendation.  (AR 47.)

She has been having vision problems since 2008, and the problems have been worsening since then.  (AR 49.)  She got a vision impaired cane in 2010, which was recommended by her eye doctor.  (AR 49.)  Using her eyes for approximately two-and-a-half hours would result in blurred vision, which would require a couple of hours of rest to recover.  (AR 51.)  The vision problems

also caused tearing, pain, and headaches.  (AR 51.)  She was prescribed eye drops, but her vision continues to worsen.  (AR 52.)  She continues to have headaches nearly every day, and the only way she was able to work between 2008 and 2010 was with medication.  (AR 53.)

She has also used a breathing unit since 2010, which was prescribed by Dr. Wine. (AR 53.)  She has used a nebulizer since 2002 two to three times per day for about eight to ten minutes each time, and she also has inhalers.  (AR 54.)  Dust and fumes aggravate her breathing condition, and she is very sensitive to these things.  She experiences shortness of breath "all the time," and fatigue.  (AR 55.)  Extreme heat, changes in the weather, and pollen make her breathing more difficult.  She had gastric bypass surgery in the past, but she is not having any problems as a result.

She has a left-foot problem that results in swelling and sores on the foot, which cause constant pain.  (AR 56.)  The longest she can be on her feet is 20 to 30 minutes.  (AR 56.)  She has pain in her legs that make sitting for longer than 20 or 30 minutes difficult, which she believes is related to her fibromyalgia.  (AR 57.)  The fibromyalgia also causes problems using her arms as she experiences weakness when trying to carry things.  To use her arms, she would need a 30-minute rest after every 20 minutes because her shoulders bother her when she does reaching activity.  (AR 58.)

She lives at home with her 13-year old son, but she does as little as possible.  Her brother-in-law does most of the sweeping, mopping, and vacuuming; he brings in the laundry so that Plaintiff can fold it.  (AR 58.)  She does not watch television because she cannot see it.  She has had surgery for her eye problem; she had a cataract removed on the right eye, and two or three Ozurdex pellets implanted.  (AR 59.)  Because of her eye problem, she can no longer cook, read, or drive.  (AR 59.)

**2.     Testimony of the VE**

A Vocational Expert ("VE") offered testimony at the hearing.  (AR 64-68.)   The VE characterized Plaintiff's past work as a home attendant, which is classified under the Dictionary of Occupational Titles ("DOT") as 354-377-014, medium, semi-skilled work with an SVP of 3.  (AR 64.)  She also performed past work as a medical assistant, DOT 079.362-010, which is classified

1    as light, skilled work with an SVP of 6.  Finally, she also performed work as a cashier, which is

2    characterized as light and unskilled work with an SVP of 2.

3         The ALJ posed several hypotheticals for the VE to consider.  The ALJ asked the VE to

4    assume a person of Plaintiff's age, education, and work experience who is limited to medium

5    work.  This person is also limited to no more than frequently operating foot controls bilaterally,

6    may never climb ladders, ropes or scaffolds; may occasionally kneel; frequently perform bilateral

7    overhead reaching; may only perform jobs while using a handheld assistive device for uneven

8    terrain or prolonged ambulation; and must avoid moderate exposure to pulmonary irritants such as

9    fumes, odors, dust, gases and poorly ventilated areas but does not include pet dander; must also

10   avoid concentrated exposure to operational control of moving machinery and unprotected heights;

11   and is limited to occupations that do not require the reading of fine print.  The ALJ also

12   hypothesized this person would be limited to simple, routine and repetitive tasks and low stress

13   work defined as no more than occasional decision making or changes in the work setting, and no

14   more than occasional interaction with co-workers.  (AR 64-65.)  The VE testified that a person

15   with these limitations could perform Plaintiff's past work as an assembler and a cashier.  (AR 65.)

16        The ALJ posed a second hypothetical that was the same as the first, but the person would

17   be limited to light work.  (AR 65.)  The VE testified that such a person would be able to perform

18   Plaintiff's past work as an assembler and cashier.  (AR 65.)  The ALJ then asked if this same

19   person was limited to only sedentary work, whether this person could perform any of Plaintiff's

20   past work.  (AR 65.)  The VE testified that none of Plaintiff's past work could be performed by

21   such a person, but this person could perform work as an order clerk, DOT 209.567-014;

22   assembler, DOT 734.687-018; and nut sorter, DOT 521.687-086.  (AR 65.)

23        The ALJ then asked the VE to assume all the limitations posed in the first hypothetical, but

24   with the added limitation of being able to sit only 30 minutes, stand/ walk 10 minutes, and would

25   be off-task more than 10 percent of the time.  (AR 66.)  The VE testified there would be no work

26   that such an individual could perform.  (AR 66.)

27        Plaintiff's counsel also posed hypotheticals for the VE to consider.  (AR 66.)  Plaintiff's

28   counsel asked whether an order clerk position would involve the use of "fine" vision.  (AR 66.)

1   The VE testified reading fine print would be the same as using fine vision.  (AR 67.)  Plaintiff's

2   counsel asked whether the assembler job would require good vision, and the VE testified there

3   would certainly need to be "adequate vision" to see the products.  (AR 67.)  Plaintiff's counsel then

4   asked whether a nebulizer could be used at lunch, and whether the use of a breathing oxygen unit

5   would impede the ability to perform the work cited.  (AR 67.)  The VE testified that such a need

6   would impact all the jobs identified.  (AR 67.)  Plaintiff's counsel also asked, considering the first

7   hypothetical, if the person also had photosensitivity and difficulty under bright lights or sunlight,

8   and a problem with distant vision (further than 10 feet away), would that impact the jobs the

9   person could perform.  (AR 67.)  The VE testified that if the person were limited to wearing

10  sunglasses with her tasks, then this would not be an impediment to performing the work identified.

11  (AR 68.)

12  **D.      The ALJ's Decision**

13        On November 21, 2012, the ALJ issued a decision finding Plaintiff not disabled since July

14  16, 2008, the date her disability ended.  (AR 21-33.)  The ALJ found that (1) Plaintiff had not

15  engaged in substantial gainful activity since July 16, 2008; (2) Plaintiff currently has the following

16  severe impairments: uveitis OD/OS, pars planitis, osteoarthritis, fibromyalgia, hypothyroidism,

17  asthma/COPD, anxiety, and depressive disorder, NOS; (3) Plaintiff did not have an impairment or

18  combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part

19  404, Subpart P, Appendix 1; (4) Plaintiff is unable to perform her past relevant work; and (5) there

20  is alternative work in the national economy that Plaintiff can perform.  (AR 21-33.)  Plaintiff

21  retained the following Residual Functional Capacity ("RFC"):

22        . . . .[T]o perform sedentary work as defined in 20 CFR 404.1456(a) except she can
23        no more than frequently operate foot controls bilaterally.  She can never climb
          ladders, ropes, or scaffolds.  She can occasionally kneel and frequently reach
24        overhead, bilaterally.  She is limited to jobs that can be performed while using a
          hand held assistive device for uneven terrain or prolonged ambulation.  She must
25        avoid moderate exposure to pulmonary irritants, including fumes, odors, dusts,
          gases and poorly ventilated areas but does not include pet dander.  She must also
26        avoid concentrated exposure to operational control of moving machinery and
          unprotected heights.  She is further limited to occupations that do not require
27        reading of fine print.  She is limited to simple, routine and repetitive tasks and low
          stress work (low stress is defined as no more than occasional decision making or

28

11

changes in the work setting) and she [is] limited to no more than occasional interaction with co-workers.

(AR 25.)  The ALJ concluded that Plaintiff is not disabled, as defined in the Social Security Act, from July 16, 2008, through the date of decision.  (AR 33.)

**E.      The Appeals Council Decision**

Plaintiff sought review of the ALJ's decision with the Appeals Council, which was denied on September 10, 2014.  (AR 1-7, 15-17.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

**F.      Plaintiff's Current Appeal**

On November 10, 2014, Plaintiff filed the current complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff contends that the ALJ erred in weighing the medical evidence and improperly discredited Plaintiff's lay statements.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

1

**APPLICABLE LAW**

2      An individual is considered disabled for purposes of disability benefits if he is unable to

3  engage in any substantial, gainful activity by reason of any medically determinable physical or

4  mental impairment that can be expected to result in death or that has lasted, or can be expected to

5  last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

6  1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

7  impairments must result from anatomical, physiological, or psychological abnormalities that are

8  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

9  such severity that the claimant is not only unable to do his previous work, but cannot, considering

10  his age, education, and work experience, engage in any other kind of substantial, gainful work that

11  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

12      The regulations provide that the ALJ must undertake a specific five-step sequential

13  analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

14  whether the claimant is currently engaged in substantial gainful activity.     20 C.F.R. §§

15  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

16  has a severe impairment or a combination of impairments significantly limiting her from

17  performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

18  the ALJ must determine whether the claimant has a severe impairment or combination of

19  impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

20  C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step,

21  the ALJ must determine whether the claimant has sufficient residual functional capacity despite

22  the impairment or various limitations to perform her past work.   20 C.F.R. §§ 404.1520(f),

23  416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant

24  can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§

25  404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

26  sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

27  (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

28

**DISCUSSION**

**A.      The ALJ Failed to State Clear and Convincing Reasons to Support an Adverse Credibility Determination**

Plaintiff contends the ALJ's credibility analysis was limited only to one general statement that offered no rationale or reasoning specific to the facts in the record, which is legally insufficient to support an adverse credibility determination.  The Commissioner argues the ALJ noted that objective medical evidence did not support Plaintiff's alleged limitations, treatment effectively controlled Plaintiff's conditions, and Plaintiff did not give full effort during pulmonary function testing.  The Commissioner maintains these are all valid and legitimate reasons to discredit Plaintiff's symptom testimony.  Plaintiff responds the reasons listed by Defendant constitute post-hoc rationale drawn from the ALJ's summary of the medical evidence supporting the RFC determination, which is *not* a credibility analysis as discussed in *Brown-Hunter v. Colvin*, 806 F.3d 487 (9th Cir. 2015).

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.*  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

1   *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*
2   *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. § 404.1529.
3   Other factors the ALJ may consider include a claimant's work record and testimony from
4   physicians and third parties concerning the nature, severity, and effect of the symptoms of which
5   he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

6       The clear and convincing standard is "not an easy requirement to meet," as it is "'the most
7   demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.
8   2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General
9   findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not
10  credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d
11  1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

12      In *Brown-Hunter*, the claimant argued the ALJ failed to provide clear and convincing
13  reasons for rejecting her symptom testimony.  806 F. 3d at 491.  The district court, however,
14  identified inconsistences in the ALJ's summary of the medical record that it determined gave rise
15  to reasonable inferences about Plaintiff's credibility.  *Id.*  On appeal, the Ninth Circuit held the
16  ALJ had failed to identify the testimony she found not credible, and she did not link that testimony
17  to the particular parts of the record supporting the non-credibility determination.  *Id.* at 493.  The
18  Court reasoned that even if the district court's analysis was sound in identifying inconsistencies
19  with the medical record, the district court's reasoning could not overcome the ALJ's failure to offer
20  any reasoning in the first instance.  The appellate court noted the district court had "pieced
21  together medical evidence identified by the ALJ that it found inconsistent with 'an allegation of
22  excess pain,' and stated therefore that the ALJ 'identified several inconsistencies between [Brown-
23  Hunter's] testimony and the record,' and 'gave clear and convincing reasons to support [her]
24  determinations that [Brown-Hunter's] impairments were less serious than she has alleged.'"  *Id.* at
25  491.  The appellate court reversed the district court's decision, and remanded the case to the
26  agency.

27      The ALJ's decision in this case suffers the same flaw as in *Brown-Hunter*.  Although the
28  ALJ found Plaintiff's statements concerning the intensity, persistent and limiting effect of her

1   symptoms not credible to the extent they were inconsistent with the RFC, this finding is followed
2   only by a summary of the medical evidence.[6]   (AR 26-31.)   The ALJ noted Plaintiff asserted an
3   onset date in July 2008 but also observed there were generally normal examination reports in
4   November 2009 and April 2010, and Plaintiff reported she was fine on medication in June and
5   September 2010.   (AR 26.)   The ALJ also noted Plaintiff did not put in full effort on the
6   spirometrics testing in March 2011, and that the treatment report indicated Plaintiff's effort and
7   cooperation were only marginally adequate for testing purposes.   (AR 27.)   The ALJ then
8   summarized the treatment Plaintiff received for uveitis OD/OS and pars planitis in her eyes, but
9   noted Plaintiff did not have difficulty handling objects in May 2011 and did not appear to have
10  visual difficulty with routine functioning.   (AR 27.)   It was also noted her eye pain was being
11  treated by NSAIDs.  (AR 7.)

12      The ALJ discussed Plaintiff's asthma treatment and noted there were no respiratory
13  symptoms after discontinuing the oxygen during the consultative examination in March 2011.
14  (AR 27.)  The ALJ summarized the treatment Plaintiff underwent due to chronic pain in her feet,
15  hands, and shoulders but noted Plaintiff was able to ambulate normally without a cane in March
16  2011, and there was good range of motion in all her joints.   (AR 27.)   The ALJ also discussed
17  Plaintiff's treatment for possible fibromyalgia, hypothyroidism, and depressive disorder.  (AR 27-
18  31.)

19      None of the ALJ's discussion of this evidence specifically related to Plaintiff's credibility
20  or identified the grounds Defendant asserted in her brief as support for the ALJ's adverse
21  credibility finding.   Defendant was only able to offer grounds in her brief that were extrapolated
22  from the ALJ's recitation of the medical evidence, not grounds stated by the ALJ as supporting an
23  adverse credibility determination.   The ALJ's credibility determination was merely a conclusion
24  with no supporting reasons or bases cited.   As the *Brown-Hunter* court elucidated, the district
25  court may not draw inferences from the ALJ's summary of the medical evidence to infer a basis
26  for the adverse credibility determination where none is stated.   Although some of the reasons

27

28  [6] At the first step of the credibility analysis, the ALJ found Plaintiff's conditions could reasonably cause the alleged
    symptoms.  (AR 26.)  No malingering was noted.

Defendant notes, such as evidence that Plaintiff's medication effectively controlled her eye pain or that she had normal examination results long after the date of her alleged disability onset date, may be a basis to find Plaintiff less than fully credible, the ALJ must explain what statements were not credible and link those statements to the evidence of successful treatment of her conditions through medication. This Court is not empowered to make findings and draw conclusions where the ALJ did not. In short, the ALJ's credibility determination is insufficient under *Brown-Hunter*, 806 F.3d at 494-95.

**B.      The ALJ's Consideration of Dr. Tsai's Opinion Was Proper**

Plaintiff argues the ALJ erred in rejecting Dr. Tsai's opinion regarding Plaintiff's visual impairments. Although Dr. Tsai had opined Plaintiff's vision was poor and that she was unable to work, the only visual limitations included in the RFC were preclusion from reading fine print and working around heights or operating moving machinery. Plaintiff contends that the ALJ failed to give specific and legitimate reasons for discrediting Dr. Tsai's opinions.

The ALJ rejected Dr. Tsai's opinion for the following reasons:

> Dr. Tsai's conflicting opinions regarding the claimant being unable to do any work (August 12, 2011) but being able to work the next spring with restrictions involving heights, dangerous equipment or moving machinery (April 20, 2012) are given reduced weight because his opinions are based upon the [Plaintiff's] subjective complaints and the opinions are not consistent with the medical records.

(AR 29.)

**1.      Inconsistencies in Dr. Tsai's Opinions**

The ALJ found Dr. Tsai gave conflicting opinions. In August 2011, he opined Plaintiff was not able to do any work (AR 615), but in April 2012 he concluded Plaintiff was able to work with certain restrictions without any clinical bases stated to account for the change in her abilities (AR 937). Plaintiff contends these opinions are not conflicting, and the 2011 opinion is simply more detailed than the 2012 opinion. Plaintiff maintains there is no evidence Plaintiff's visual condition improved between August 2011 and April 2012. Defendant asserts that Dr. Tsai's 2011 opinion that Plaintiff was unable to work and 2012 opinion that she was able to work, without any evidence of improvement of Plaintiff's condition, highlights the inconsistency in Dr. Tsai's opinions.

1    The ALJ reasonably concluded Dr. Tsai's August 2011 and April 2012 opinions about
2  Plaintiff's ability to work and the restrictions in her vision were inconsistent.   The August 2011
3  opinion states Plaintiff was unable to work due to severely impaired vision, and notes that she had
4  very poor night vision, poor depth perception, and poor vision handling fine objects.   (AR 615,
5  667.)  In April 2012, Dr. Tsai opined Plaintiff's ability to work was merely restricted and she could
6  not work around heights, dangerous equipment, or moving machinery, and she was precluded
7  from reading fine print.  (AR 937-38.)  Dr. Tsai provides no basis for the change in his opinion,
8  and due to Plaintiff's contention that her eye sight continued to worsen during this time, the two
9  opinions appear inconsistent.  This facial inconsistency is a legitimate reason to reject Dr. Tsai's
10  August 2011 opinion that Plaintiff was completely restricted from working due to her eye
11  condition.   The limitations Dr. Tsai noted in his 2012 opinion—i.e., that her fine vision was
12  impaired and she should be restricted from working around heights, dangerous equipment, or
13  moving machinery—was incorporated into the RFC.  (*Compare* AR 937 *with* AR 25.)  Plaintiff
14  has not shown the ALJ erred in finding Dr. Tsai's opinions inconsistent and in disregarding Dr.
15  Tsai's 2011 opinion that Plaintiff's eye condition precluded her from work on this ground.

16    **2.      The ALJ's Rejection of Dr. Tsai's Opinions as Predicated on Subjective**
17    **Testimony and Inconsistent with Medical Records is Harmless Error**

18    The ALJ also gave Dr. Tsai's opinions reduced weight because they were "based upon the
19  subjective complaints and the opinions [were] not consistent with the medical records."  (AR 29.)
20    Plaintiff contends the ALJ identified no evidence establishing Dr. Tsai's opinions were
21  based on Plaintiff's subjective complaints or were inconsistent with her medical records.    The
22  Commissioner maintains it is appropriate for the ALJ to reject an physician's testimony that is
23  found to rely on the claimant's subjective complaints where the claimant has been deemed
24  incredible.  Further, the medical records are inconsistent with Dr. Tsai's opinions:  Dr. Chen found
25  Plaintiff could move around the office without difficult (AR 527), and Dr. Tsai's treatment notes
26  often reported improvement in her condition.
27
28

18

1    Discrediting Dr. Tsai's opinions as based on Plaintiff's non-credible subjective complaints

2  and for lack of consistency with the medical evidence is legally insufficient.   First, the ALJ

3  provided no specific examples of objective evidence that were inconsistent with Dr. Tsai's

4  opinions, but merely concluded it was not consistent with the medical records.  *Embrey v. Bowen*,

5  849 F.2d 418, 412 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient

6  objective findings or are contrary to the preponderant conclusions mandated by the objective

7  findings does not achieve the level of specificity our prior cases have required, even when the

8  objective factors are listed seriatim.").   Second, as discussed above, Plaintiff's credibility was not

9  properly considered by the ALJ; thus, Plaintiff's lack of credibility does not provide a sufficient

10  basis to reject Dr. Tsai's opinion.

11    Nonetheless, the ALJ stated a specific and legitimate reason to reject Dr. Tsai's opinions in

12  finding them inconsistent.  Moreover, the restrictions noted in Dr. Tsai's April 2012 opinion were

13  included in the RFC.  Therefore, any error in considering Plaintiff's subjective testimony or

14  inconsistency with the medical evidence in rejecting Dr. Tsai's opinion is harmless.  *Molina v.*

15  *Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (ALJ error is harmless where it does not alter the

16  ultimate non-disability determination).

17  **C.     The ALJ's Consideration of Plaintiff's Lung Disease Was Legally Sufficient**

18    The ALJ concluded the only impairment resulting from Plaintiff's lung disease was a

19  preclusion from moderate exposure to pulmonary irritants such as fumes, odors, dusts, gases, and

20  poorly ventilated areas.   (AR 25.)   Plaintiff argues a finding of such minimal limitation is

21  predicated on the erroneous rejection of Dr. Olson's opinions, as well as the silent, and thus

22  improper, rejection of Dr. Logue's diagnosis and PFT findings in November 2011 which establish

23  that Plaintiff's condition meets Listing 3.02.

24    **1.     The ALJ Did Not Err in Considering Listing 3.02**

25    Plaintiff contends the ALJ failed to consider findings made by Dr. Logue that show

26  Plaintiff's obstructive lung disease meets Listing 3.02.  Specifically, Listing 3.02, for pulmonary

27  disorders, requires a testing of the forced expiratory volume ("FEV1") at specific values

28  corresponding to a person's height.   At 5'7, Listing 3.02 requires that Plaintiff demonstrate an

1   FEV1 equal to or less than 1.35 on testing.  Plaintiff argues her FEV1 was 1.18 liters when tested

2   by Dr. Longue in November 2011, which qualifies under the Listing.

3       Defendant asserts the Listing requires that the FEV1 used for adjudication of claims is "the

4   larges of at least three satisfactory" results, which includes post-bronchodilator tests if given.  As

5   Plaintiff's FEV1 improved to 1.89 liters with the use of a bronchodilator, she does not meet the

6   Listing.  In reply, Plaintiff argues even the better test result did not show "good prognosis with

7   treatment," and she had not improved to the point where she could perform even sedentary work.

8       Whether or not Plaintiff's improved test score still did not result in a good prognosis of her

9   pulmonary condition is irrelevant to whether her testing strictly meets the requirements of the

10  Listing 3.02.    Under Listing 3.00(E), it describes the documentation necessary under the

11  pulmonary function testing and requires that the highest values of the FEV1 should be used to

12  assess the severity of the respiratory impairment.  Plaintiff does not dispute that her FEV1 tested at

13  1.89 liters (AR 803), which is her highest value FEV1 test.  Because her highest FEV1 score is

14  outside the parameters of the Listing, Plaintiff does not meet the requirements of Listing 3.02.

15  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches

16  a listing, it must meet *all* of the specific medical criteria.  An impairment that manifests only some

17  of those criteria, no matter how severely, does not qualify.").  The ALJ specifically noted Plaintiff

18  did not meet the PFT requirements under Listing 3.02.  (AR 24.)  In sum, the ALJ did not err in

19  failing to find Plaintiff disabled under Listing 3.02.

20      **2.    Dr. Logue's Diagnosis was Properly Considered**

21      Plaintiff contends the ALJ failed to incorporate or discuss Dr. Logue's diagnosis of "severe

22  obstructive lung disease."  (*See* AR 799.)  According to Plaintiff, because the diagnosis includes

23  the word "severe," it indicates significant functional limitations such as shortness of breath and

24  "common" exacerbations.

25      The diagnosis itself appears to have been adopted by the ALJ who found Plaintiff's

26  asthma/COPD was a severe condition.  (AR 23.)  A mere diagnosis, however, does not imply

27  significant functional limitation at Step Four of the sequential evaluation.  *See Matthews v.*

28  *Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The use of the word "severe" in the diagnosis also does

not necessarily imply disabling functional limitation.  Dr. Logue noted Plaintiff's pulmonary condition came with a "near-normal" diffusing capacity, she had a profound bronchodilator response, and her CT showed very minimal emphysema findings and minimal scarring.  (AR 799.) Dr. Logue also noted Plaintiff remained on supplemental oxygen, but her ongoing need for the oxygen and whether it provided any benefit was unclear.  (AR 799.)  He concluded only that Plaintiff would follow up for re-evaluation in a few months.  (AR 799.)  Dr. Logue's findings undercut Plaintiff's argument that Dr. Logue's diagnosis alone implies severe functional limitations.  Plaintiff's argument that the ALJ improperly failed to account for Dr. Logue's diagnosis is unpersuasive, and the Court perceives no error in this regard.

### 3.    ALJ's Rejection of Dr. Olson's Opinions Was Proper

The ALJ ascribed less weight to the opinions of Dr. Olson because of inconsistencies. Plaintiff contends the inconsistencies noted by the ALJ between the two opinions Dr. Olson rendered in 2011 and 2012 are not legitimate.  Although the ALJ determined Dr. Olson reached differing conclusions in the two opinions based on the same findings, Plaintiff argues the two opinions were nearly a year apart and thus would not necessarily be identical.  Further, any contradictory findings in the opinions should have been resolved by following up with Dr. Olson for clarification before the opinions were rejected.  As to the ALJ's finding that Dr. Olson's opinion about Plaintiff's ability to work is an issue reserved to the Commissioner, the ALJ was still required to state reasons for rejecting the opinion.  Plaintiff argues Dr. Olson's opinion that Plaintiff could not perform the sitting, standing, and walking requirements of full-time work should be credited and benefits should be paid.

The Commissioner argues the ALJ gave specific reasons for not giving Dr. Olson's opinions weight beyond that Dr. Olson's opinion about Plaintiff's ability to work was an issue reserved to the Commissioner.  Defendant notes the ALJ cited inconsistencies between Dr. Olson's opinion and the medical record, and noted that Dr. Olson's 2011 and 2012 opinions were inconsistent with each other.

On August 9, 2011, Dr. Olson completed a questionnaire regarding Plaintiff's treatment. (AR 614, 666-67.)[7]   He answered "no" to the question whether Plaintiff's medical problems precluded her from performing full time work at any exertion level, but opined that her impairments restricted her to sedentary work only.  (AR 666.)  He listed her primary impairments as asthma/COPD, and noted she was on oxygen.   Dr. Olson listed the objective findings supporting his opinion were wheezing, decreased breathing sounds, and a prolonged expiratory phase.  He opined Plaintiff would be able to sit for 1.5 hours in an 8-hour day, and could stand and walk 20 minutes in an 8-hour day.  He opined Plaintiff was totally precluded from work around fumes; markedly impaired from work around dust, humidity, temperature extremes, and machinery; and moderately impaired from work around noise, chemicals, and heights.  (AR 666.) He also noted Plaintiff relied on a nebulizer, which was necessary, and she had a PFT scheduled. He indicated her vision was very poor and opined she had been disabled *to this degree* since May 2010. (AR 614.)

On June 29, 2012, Dr. Olson completed another questionnaire about Plaintiff's eye condition.  (AR 940-41.)  He responded "yes" to a question asking whether Plaintiff's medical problems precluded her from any full time work (AR 940); he listed Plaintiff's primary impairment as severe respiratory condition and noted she was on "continuous oxygen."  (AR 940.) Dr. Olson listed objective findings as wheezing, decreased breath sounds, and "prolonged expiratory phase."  (AR 940.)  He opined Plaintiff could only sit for 30 minutes during an 8-hour day and could only stand and walk for 10 minutes in an eight-hour day; he found Plaintiff totally restricted from fumes; markedly restricted from dust, humidity, temperature extremes, and working around machinery; and he opined she was moderately restricted from work around noise, chemicals, and heights.  (AR 940.)  He noted Plaintiff's nebulizer was medically necessary, and that if she did not have the breathing machine there would be a daily need for emergency room treatment.   (AR 941.)   In answer to whether Dr. Olson felt Plaintiff could effectively work indoors, he answered, "No. Nearly blind also."  (AR 941.)  As an additional work limitation, Dr.

---

[7] The pages of the questionnaire are separated in the record.  The first two pages of the questionnaire are located at AR 667-68, and the third page appears at AR 614.  Only the third page is dated.  (AR 614.)

1    Olson noted Plaintiff is "legally blind" and indicated she had been disabled *to this degree* since

2    May 2010.  (AR 941.)

3          The ALJ found these opinions inconsistent:  in the 2011 opinion, Dr. Olson found Plaintiff

4    able to perform sedentary work, but in 2012, he found she could not perform any full-time work,

5    yet there were no additional findings to support the more restrictive 2012 opinion.  Although Dr.

6    Olson noted Plaintiff's vision problems in the 2011 opinion, he indicated she was "legally blind" in

7    2012 but provided no findings to support the basis for his conclusion that her condition had

8    progressed from a vision problem to constituting legal blindness.  In both opinions, Dr. Olson

9    indicated Plaintiff's disability to the degree opined in the questionnaire began in May 2010, but the

10   ALJ noted she was found less impaired in 2011 (able to perform sedentary work), so her level of

11   impairment noted in 2012 (unable to perform *any* work) could not have begun in 2010.  Put

12   differently, his 2012 opinion that Plaintiff was restricted from all work beginning May 2010 is

13   inconsistent with his opinion in 2011 that Plaintiff could perform sedentary work.  Substantial

14   evidence supports the ALJ's finding the two opinions are inconsistent.  *See Young v. Heckler*, 803

15   F.2d 963, 968 (9th Cir. 1986) (per curiam) (treating doctor's conclusory opinion that claimant was

16   disabled was properly rejected by ALJ when it was internally inconsistent and not consistent with

17   the doctor's medical reports).

18         The ALJ also found the two opinions were not credible because they reached different

19   conclusions based on the same clinical findings.  Plaintiff contends the opinions are subject to the

20   logical inference that the PFT results in November 2011 showed disabling obstructive lung

21   disease, and this was the reason for Dr. Olson's more restrictive 2012 opinion.  This, however, is

22   not reflected in Dr. Olson's report.  He was given an opportunity to list the objective findings upon

23   which his opinion was based and declined to list the November 2011 PFT results.  Plaintiff also

24   notes that in 2011, Dr. Olson opined Plaintiff could perform full-time sedentary work, but could

25   only sit for 1.5 hours in an 8-hour day and could only stand for 30 minutes in an 8-hour day.

26   Plaintiff argues this internal inconsistency required the ALJ to re-contact Dr. Olson to provide a

27   clarifying explanation rather than rejecting the opinion wholesale.

28

1      Plaintiff's supposition as to why Dr. Olson's 2012 report was more restrictive than his 2011

2   report is only a theory as to why the two reports based on the same clinical findings provided

3   differing conclusions regarding whether Plaintiff could work and does not provide a basis—even

4   if a reasonable assumption—to find error in the ALJ's decision.  *Thomas v. Barnhart*, 278 F.3d

5   947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational

6   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld.").

7      Turning to Plaintiff's contention that Dr. Olson's 2011 opinion was internally inconsistent

8   requiring further development of the record by ALJ, an ALJ has a duty to develop the record only

9   when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation

10  of the evidence.  *See, e.g., Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

11  Nonetheless, where there is sufficient evidence in the record to make a determination, the ALJ is

12  not required to re-contact physicians who submit poorly crafted, unsupported, or inadequate

13  reports and opinions unless it renders the medical evidence, taken as a whole, ambiguous or

14  inadequate to allow for proper evaluation.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir.

15  2005) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)).  Dr. Olson's 2011 questionnaire is internally

16  inconsistent with regard to his opinion that Plaintiff was able to work full-time but could only sit,

17  stand, or walk for a total of 2 hours out of an 8-hour day.  This inconsistency bears directly on the

18  credibility and weight of Dr. Olson's opinion.  One poorly supported and crafted opinion that a

19  claimant is disabled does not render the medical evidence of record ambiguous or inadequate for

20  proper evaluation such that re-contacting Dr. Olson was necessary.

21     Moreover, while the ALJ declined to give deference to Dr. Olson's opinion that Plaintiff

22  was unable to work as a finding reserved to the Commissioner, the inconsistencies noted by the

23  ALJ in Dr. Olson's report provide specific and legitimate reasons supported by substantial

24  evidence to reject the opinion that Plaintiff was precluded from work and the particular extent of

25  her opined limitations.  *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam)

26  (treating doctor's conclusory opinion that claimant was disabled was properly rejected by ALJ

27  when it was internally inconsistent and not consistent with doctor's medical reports); *Thomas v.*

28  *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ need not accept opinion of any physician that is

inadequately supported by clinical findings).  In sum, the ALJ did not err in rejecting Dr. Olson's opinions.

### 4.    Dr. Chen's Opinion was Properly Considered

Plaintiff makes a very brief argument that Dr. Chen opined Plaintiff "was limited by her need to use oxygen, which was all the time. . . The ALJ did not incorporate this limitation into his RFC finding, which is error."  (Doc. 19, 24:18-22.)  Dr. Chen noted Plaintiff was diagnosed with COPD and had been using oxygen since May 2010.  (AR 526.)  He also observed Plaintiff came to the examination with her own oxygen, but there were no respiratory symptoms after discontinuation of the oxygen during the examination.  (AR 527.)  Dr. Chen did not include any limitation due to oxygen in the functional assessment, and it does not appear he felt Plaintiff was limited by her need to use oxygen.  He noted only that she had oxygen therapy per her physician's prescription.  (AR 528.)  And, although Dr. Olson indicated Plaintiff needed oxygen "all the time," this opinion was not credited by the ALJ.  More importantly, when Plaintiff underwent PFT testing with Dr. Logue in November 2011, he noted that even though Plaintiff remained on supplemental oxygen, Dr. Logue was "not clear as to the ongoing needs or benefits of supplemental oxygen."  (AR 799.)  There is no indication Dr. Chen actually opined Plaintiff needed to use her oxygen continually, and the only physician opinion noting this requirement was discredited.  In sum, Dr. Chen's opinion was properly considered, and the ALJ did not err in failing to include a limitation in the RFC for necessary reliance on oxygen.

### D.    The ALJ's Consideration of Plaintiff's Mental Condition

Plaintiff contends the ALJ failed to include Dr. Fetterman's opinion regarding Plaintiff's ability to maintain attendance and handle work-related stress and LCSW Crenshaw's opinion that Plaintiff had significant deficits in a number of areas of her mental functioning.

### 1.    Dr. Fetterman's Opinion

Plaintiff argues the ALJ failed to give specific and legitimate reasons for rejecting Dr. Fetterman's opinion that Plaintiff was impaired in her ability to handle work-related stress. Although the ALJ included a limitation to "low-stress" work in the RFC, he defined that as "no more than occasional decision making or changes in the work setting."  (AR 25.)  According to

1   Plaintiff, her inability to handle stress was predicated on more than decision making or changes in

2   the work setting, and thus the limitation in the RFC does not adequately encompass Dr.

3   Fetterman's opinion it this regard.  Plaintiff also argues Dr. Fetterman opined Plaintiff's ability to

4   complete a normal workweek and handle work-related stress was only "fair," which is not "good"

5   or "adequate."  The ALJ did not address these "fair" abilities or incorporate them meaningfully

6   into the RFC.

7        The Commissioner contends the ALJ's RFC analysis incorporated Dr. Fetterman's opinion

8   by limiting Plaintiff to low-stress work that involved only occasional decision making and

9   occasional changes, which encapsulates Plaintiff's fair ability to handle work-related stress.

10  Although Plaintiff argues that "fair" means less than "adequate" and precludes work activity, Dr.

11  Fetterman defined adequate to mean "there are no noted impairments at this time."  Thus, "fair"

12  does not necessarily preclude work activity, even assuming it represents less ability than that

13  which is "adequate."

14       The ALJ credited Dr. Fetterman's opinion that Plaintiff was impaired in her ability to

15  handle work-related stress, complete a normal workweek, and maintain regular attendance at work

16  due to her mental symptoms.  (AR 552-53.)  Similarly, non-examining physician Dr. Cogbill

17  opined Plaintiff had moderate limitations in concentration, persistence, and pace, as well as social

18  functioning, which the ALJ credited.  (AR 29, 557.)  Interpreting and synthesizing both these

19  opinions, the ALJ concluded Plaintiff was "limited to simple, routine and repetitive tasks and low

20  stress work (low stress being defined as no more than occasional decision making or changes in

21  the work setting) and she [is] limited to no more than occasional interaction with co-workers."

22  (AR 25.)  A limitation to jobs that require no more than occasional decision making or changes is

23  a reasonable limitation encompassing the fair abilities Dr. Fetterman's opinion noted.  The ALJ is

24  not required to adopt the exact wording of a physician, but may translate mental limitations into

25  concrete restrictions.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (explaining

26  how an ALJ may translate mental limitations into concrete restrictions where the ALJ's assessment

27  is "consistent with restrictions identified in the medical testimony").  That Plaintiff's abilities were

28  only "fair" does not imply she was precluded or severely limited in the areas of stress or in her

1   ability to maintain attendance, particularly as Dr. Cogbill opined Plaintiff was only moderately

2   limited in the ability to complete a normal workweek due to psychological symptoms.  (*See* AR

3   557.)

4       It is unclear what limitation Plaintiff believes the ALJ should have included in the RFC to

5   address her fair ability to handle stress, attend work, and complete a normal workweek.  It is

6   reasonable to expect that jobs that are lower stress do not change often in setting, and are simple,

7   routine, and repetitive, and are more likely to be the type of work a person could perform even

8   when experiencing some psychological symptoms because the work does not require

9   concentration and attention to numerous and changing variables.  In other words, work in a high-

10  stress environment involving many details and variables and requiring ongoing decision-making

11  may be more difficult to attempt when a person experiences psychological symptoms and thus

12  increasing absences.  A low stress, simple job would reasonably address attendance, completion,

13  and pace limitations.

14      Plaintiff also contends that even though LCSW Crenshaw opined Plaintiff's ability to

15  function in several areas was "fair" or "poor," the ALJ gave no reasons for rejecting those

16  limitations.  LCSW Crenshaw opined Plaintiff had an impaired ability to deal with social

17  interactions, poor concentration and memory which impaired her problem solving skills, fair

18  ability to understand, remember, and carry out 1-2 step job instructions, poor ability to maintain

19  attention and concentration for at least two-hour increments, and a poor ability to withstand the

20  stress and pressure of a full-time job.  (AR 942.)  This opinion was generally credited and given

21  "appropriate" weight by the ALJ.  (AR 31.)

22      The ALJ's RFC indicates this opinion was incorporated with that of Drs. Fetterman and

23  Cogbill's and included in the RFC.  A poor ability to maintain attendance at full-time work and

24  deal with work stress is reasonably accommodated by a simple, routine, repetitive job that is also

25  low-stress—i.e., no more than occasional decision making or changes in the work setting.  As

26  discussed above in the context of Dr. Fetterman's opinion that Plaintiff had a fair ability to deal

27  with work-related stress, a simple and repetitive job would reasonably accommodate someone

28  who occasionally suffered psychological symptoms because such work does not include complex

1   variables, changing expectations, or require difficult decision-making.  Moreover, the ALJ limited

2   Plaintiff to jobs with few interactions with co-workers, which would also generally involve lower

3   stress.  The ALJ's formulation of the RFC in view of LCSW Crenshaw is also bolstered by the

4   opinions of Drs. Cogbill and Fetterman who opined Plaintiff's limitations in the area of dealing

5   with work stress and maintaining work attendance were generally only moderate, and she retained

6   "fair" abilities in these areas.  (AR 557 (Cogbill opines Plaintiff has moderate limitation to

7   completing full workweek due to symptoms; AR 552-53 (Fetterman opines Plaintiff has "fair"

8   ability to complete normal workday or workweek without interruptions from psychiatric condition

9   and fair ability to deal with routine work stress).)

10       Although LCSW Crenshaw opined Plaintiff had poor concentration and memory, simple

11   and repetitive work would also reasonably encompass this limitation, particularly since LCSW

12   Crenshaw opined Plaintiff had a fair ability to remember and carry out 1-2 step job instructions.

13   The ALJ's RFC reflects consideration of LSCW Crenshaw's opinion about Plaintiff's limitations,

14   particularly as it is generally congruous with Dr. Fetterman's and Dr. Cogbill's opinions of

15   Plaintiff's limitations and abilities.  The ALJ's RFC is a reasonable and rational harmonization of

16   these opinions and does not appear to be a rejection of LCSW Crenshaw's opinion.

17   **E.      Remand Is Appropriate**

18       The ALJ's credibility analysis is deficient under *Brown-Hunter*, and Plaintiff contends her

19   testimony should be credited as true, and benefits should be awarded.  Usually, "[i]f additional

20   proceedings can remedy defects in the original administrative proceeding, a social security case

21   should be remanded."  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Courts are

22   empowered to affirm, modify, or reverse a decision by the Commissioner "with or without

23   remanding the cause for rehearing."  42 U.S.C. § 405(g).  Courts generally exercise this power

24   when it is clear from the record that a claimant is entitled to benefits.  *Garrison*, 759 F.3d at 1019.

25   "[W]here there are no outstanding issues that must be resolved before a proper disability

26   determination can be made, and where it is clear from the administrative record that the ALJ

27   would be required to award benefits if the claimant's excess pain testimony were credited, we will

28   not remand solely to allow the ALJ to make specific findings regarding that testimony.  Rather, we

will . . . take that testimony to be established as true." *Id.* (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988).

Similar to *Burrell*, the Commissioner points to evidence in the record not discussed by the ALJ that suggests Plaintiff may not be credible. 775 F.3d at 1141-42. Plaintiff's alleged date of onset in July 2008 conflicts with medical evidence showing she had normal examinations in November 2009 and was generally doing well in April 2010, June 2010, and September 2010. (AR 328, 365, 371.) There is also evidence suggesting Plaintiff's treatment adequately controlled her conditions, and she appeared not to give full effort during pulmonary function testing. These factors are credibility considerations the ALJ may take into account. Remand for further proceedings to allow the ALJ to do so is the appropriate remedy. *Id.*

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 11, 2016**                              **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE